## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROSENDO GARCIA,

      Plaintiff,

v.                                  No. CIV 06-528 LFG

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Rosendo Garcia ("Garcia") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Garcia was not eligible for social security income ("SSI") or disability insurance benefits ("DIB"). Garcia moves this Court for an order reversing the Commissioner's final decision or remanding for a rehearing. [Doc. 12.]

### Background

Garcia was born on February 26, 1954 and is married. [Tr. 43, 52, 206.] Garcia was 51 years old at the time the administrative law hearing was held. He has a high school education and worked for a number of different employers from 1986 through part of 2004. Prior to his accidental injury in 2004, Garcia had a significant work history. Garcia worked at American Furniture from about

1

1986 to 1996.  He held a number of subsequent jobs for shorter periods of time.  Garcia's past relevant work was as a warehouse worker, forklift operator and material handler.  [Tr. 52, 54, 204.]

On August 30, 2004, Garcia submitted applications for DIB and SSI benefits.  [Tr. 12.]  The applications are not part of the record; thus, the Court relies on the ALJ's decision for this date.  Garcia claims a disability onset date of June 2, 2004, due to having fractured both wrists during a fall from a ladder.  [Tr. 13.]  Garcia had surgery on both wrists, and his right wrist healed better than the left.  His is right hand dominant.  Garcia claims he is unable to work due to constant pain and weakness in both hands.  [Tr. 52-53.]  As of the date of the administrative law hearing, September 7, 2005, Garcia was working two-hour shifts, cleaning windows and taking out trash six nights a week.  He indicated the trash weighed about 15-20 pounds but claimed he had difficulty doing this type of work because of problems with mobility and weakness in his hands.  [Tr. 206.]  He also testified that he suffered from numbness in both hands.  [Tr. 208.]

At the September 7, 2005 administrative law hearing, Garcia was represented by counsel.  [Tr. at 201.]  In a decision, dated January 12, 2006, the administrative law judge ("ALJ") found that Garcia was not eligible for benefits.  The ALJ specifically determined that Garcia had the residual functional capacity ("RFC") to perform a limited range of medium work as set forth in hypothetical questions posed to a vocational expert ("VE") and that work was available in the national or local economy.  [Tr. 14, 217-18.]  On May 5, 2006, the Appeals Council denied Garcia's request for review.  [Tr. 4.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, he is capable of performing other work.[8]

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[9]

<u>**Standard of Review and Allegations of Error**</u>

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  <u>Glenn v. Shalala</u>, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  <u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1329 (10th Cir. 1992); <u>Muse v. Sullivan</u>, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  <u>Hamilton v. Secretary of Health & Human Servs.</u>, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  <u>Id.</u> at 1497-98.  In <u>Clifton v. Chater</u>, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

---

national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]<u>Muse v. Sullivan</u>, 925 F.2d 785, 789 (5th Cir. 1991).

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).   If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.   The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.   Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After thoroughly and carefully reviewing the medical records, the ALJ concluded that Garcia was not disabled under the standards of the Social Security Act.   [Tr. at 12-20.]   In reaching this decision, the ALJ made the following findings: (1) Garcia did not engage in substantial gainful activity during the pertinent time frame; (2) his status, post left wrist infection and status, post open reduction and internal fixation of bilateral distal radius fractures were considered "severe" impairments; (3) these impairments were not severe enough to meet or equal a Listing; (4) Garcia's allegations of his limitations were not totally credible; (5) Garcia retained a RFC to perform a limited range of medium work consistent with the hypothetical question presented to the VE; (6) he was unable to perform his past relevant work; (7) he has been an individual closely approaching advanced age, age 50-54 at all pertinent times; (8) he has a high school education; (9) Garcia had no transferable skills from semi-skilled work previously performed; (10) although his exertional limitations did not allow him to perform the full range of medium work, using the grids as a framework, there were a significant number of jobs in the national economy that he could perform, including shipping and receiving weigher, sales attendant (customer service) and surveillance system monitor (gaming); and (11) Garcia was not under a disability, as defined by the Social Security Act, at any time through the date of the ALJ's decision.  (Tr. 19-20.)

In this appeal, Garcia argues that the ALJ committed three errors: (1) the RFC finding was contrary to the treating doctor's opinion, and therefore, was not supported by substantial evidence

and was contrary to law; (2) the ALJ's reliance on the jobs identified by the VE was error because the VE's testimony conflicted with the DOT and was unexplained; and (3) the ALJ's credibility findings were not supported by substantial evidence and were contrary to law.  [Doc. 13, p. 3.]  The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the ALJ used correct legal standards in her evaluation of the evidence.  [Doc. 16.][10]

After a review of the entire record, this Court finds that the case should be remanded for a rehearing before the ALJ.  The Court's reasons are set out below.

### Summary of Garcia's Work History, Medical Conditions and Treatment

From about 1986 to 1996, Garcia was a receiving supervisor for American Furniture. [Tr. 54.] From 1996 until May 2004, Garcia worked for a number of different employers for shorter periods of time.  He worked as a driver, warehouse employee, materials handler, receiver, forklift operator, order puller and stocker.  [Tr. 54.]  Garcia stated he was laid off from his last employment on May 15, 2004.  [Tr. 53.]

Although Garcia states a disability onset date of June 2, 2004, he actually did not suffer the fractures to both wrists until June 19, 2004.  [Tr. 95.]  Thus, it is unknown whether Garcia simply was mistaken as to the onset date or if there were typographical errors concerning that date.

A June 19, 2004 UNM medical record indicates Garcia was working on the air conditioner on the roof of his home when he climbed a ladder and subsequently fell 8-10 feet.  This was not the first time Garcia sustained serious injury to his wrists.  Garcia previously broke both wrists and also sustained broken bilateral scaphoids.  [Tr. 96.]  A June 19, 2004 medical record notes that there was

[10]No reply was filed, and briefing was complete as of March 12, 2007. [Doc. 17.]

"gross deformity" of Garcia's left upper extremity wrist with notable swelling.  X-rays confirmed that there were bilateral distal radius fractures.  This record notes that Garcia consumed alcohol regularly, while other medical records filled out by Garcia show that he did not drink.  [Tr. 102, 140, 210.]

On June 25, 2004, Dr. Tahseen Cheema performed a bilateral open reduction and internal fixation of the fractured distal radius.  Dr. Cheema noted that Garcia had pre-existing significant arthritis in both wrists, mostly on the left side.  The fracture on the left wrist was more comminuted and displaced.  [Tr. 160.]  On June 21, 2004, Dr. Mourikis observed that some of Garcia's fractures were old and while the physicians were not addressing them at this time, they needed to be evaluated. [Tr. 176.]

On July 12, 2004, Garcia followed up with Dr. Cheema, who noted that the left wrist was fixed with an internal fixation system and the right was fixed with an innovation volar distal radius plate.  Garcia had done well since the procedure and was not complaining of significant pain.  His wounds were healing well, and the stitches were removed.  [Tr. 158.]

On July 26, 2004, Dr. Mourikis saw Garcia and commented that the wounds were nicely healed and Garcia's range of motion had been progressing.  Garcia was wearing splints and engaging in active range of motion.  [Tr. 156.]

On July 30, 2004, Garcia was admitted to the hospital because of a left wrist hardware infection, status post irrigation and debridement.  [Tr. 108.]  Garcia reported a four-day history of increasing erythema, purulent drainage from the wound, fevers and chills.  [Tr. 108, 111.]  He was treated with irrigation, incision and debridement on July 30th, and admitted to the hospital for several days for wound care and IV antibiotics.  [Tr. 108.]  Garcia's condition improved during the hospital stay.  The erythema decreased significantly, and the purulent discharge had almost ceased when he

was released from the hospital.  He was to follow-up with outpatient care on Mondays, Wednesdays and Fridays.

There is no documentation in the record concerning the outpatient follow-up care.  On August 23, 2004, Dr. Cheema noted that Garcia did not complain of any significant pain and that his radial motion was improving.  Garcia was healing well on this day, and there was no active discharge from the left wrist wound.  The radial motion of his wrist was reported as: dorsifexion is 45 degrees on the right side and 40 degrees on the left and volar flexion 40 degrees on the right, 15 degrees on the left.  An x-ray showed good alignment of the fracture site and progressive healing.  [Tr. 154.]

Seven days later, on August 30, 2004, Garcia filed his applications for DIB and SSI.

On the disability report, dated August 30, 2004, Garcia reported significant difficulty and stated that both wrists were ineffective and that the second one (presumably the left) was at only 1/4 of its earlier mobility and strength.  Garcia filled out an adult function report on September 1, 2004.  He stated that he typically got up in the morning, made breakfast for himself and wife, walked the dog, did housework and some "very light" yard work.  Garcia went to the library or movies and made supper for him and his wife.  [Tr. 62.]  He stated that the pain remained in both wrists and that it was "never ending" from morning  through the night.  His hands hurt when attempting to tie shoes or to button shirts.  His one hand had little to no strength or mobility.  He was able to feed himself and do other personal care (with one hand only sometimes).  [Tr. 63.]  It was painful to prepare meals, and it took him 45 minutes to an hour to do so because of the pain.  He vacuumed, did the dishes and laundry, dusted, made the bed, swept and picked up the trash.  [Tr. 64.]  Garcia went outside every day, walked and was able to drive.  He walked 2 miles.  He shopped for groceries and clothing.  He paid the bills.  [Tr. 65.]  His hobbies included reading, watching TV, listening to music, walking the

dog, watching movies and watching sports, although he no longer could participate in sports as he had before the fractures. Garcia played cards with others and had dinners and barbecues about once a month. [Tr. 66.] He attended church and visited his family. [Tr.66.] His ability to lift was very limited due to lack of strength and mobility in his hands. [Tr. 67.]

On September 7, 2004, Garcia was seen by another orthopedic physician at UNM, Dr. Efremov. As of the prior Saturday, about five weeks after the earlier irrigation and debridement, the wound had re-opened and there was more discharge again. Dr. Efremov noted a "completely healed" surgical scar over the right wrist, but that the skin on the left was slightly erythematous. There was some slight serious drainage but no signs of infection. However, Dr. Efremov believed there was a possible recurrent abscess on the left wrist. Garcia was given an antibiotic and a gauntlet splint to wear. He was to be seen on September 13, 2004. [Tr. 152.]

On September 24, 2004, the Social Security Administration rejected Garcia's underlying claim for benefits. The SSA noted that the medical evidence showed the right wrist intervention was successful although there were complications to the left wrist. Garcia would require a period for recovery and stabilization for healing but should be able to work by June 24, 2005 without work restrictions. Thus, the SSA concluded that Garcia's limitations would not last 12 continuous months. [Tr. 39.]

Garcia was seen at UNM on October 18, 2004. Dr. Khoury noted that the right wrist had healed with minimal deformity and that Garcia was "quite pleased." However, the left wrist had a subsequent wound infection that required repeat irrigation and debridement. Garcia complained of significant pain and limited range of motion on the radial aspect of the distal radius. He was interested in surgical intervention if it could help. Garcia's had a range of motion from dorsiflexion

of 20 degrees to volar flexion of 10 degrees on the left wrist.  The doctors decided to remove the hardware in Garcia's left wrist in November.  [Tr. 145.]

Dr. Cheema's notes from the October 18, 2004 check-up indicate no significant changes in alignment or appearance of the internal fixating devices used in reducing the osteochondral fracture of the radius at the wrist.  The vertical fracture line extending from the base of the radial styloid distally through the joint was still relatively well defined.  There was no significant change in appearance of the carpal navicular fracture or the single stabilizing screw.  The record states "no significant healing" and "nonunion."  [Tr. at 147, 149.]

On October  20, 2004, Garcia filled out a disability report for his appeal.  He noted he had had an ongoing left wrist infection since his last disability report.  He had surgery scheduled for November and was suffering from "constant pain" in both wrists.  Garcia took non-prescription Ibuprofen for pain as needed.  [Tr. 70.]  He needed help dressing, including putting on socks, typing shoes and fastening his belt.  His activities were "very limited" due to weakness and limited range of motion in both hands.  [Tr. 74.]

On November 2, 2004, Dr. Cheema removed the hardware plus some bone from Garcia's left wrist.  He irrigated the soft tissue and performed debridement.  He found there was an infected nonunion of the distal radius in Garcia's wrist.  A portion of the diaphysis was found to be necrotic, and there was purulent material in the wound.  Since Garcia was having pain and some signs of infection, there was surgical indication to remove the hardware from the left distal radius.  Dr. Cheema observed swelling and erythema over the previous surgical incision, and the mass in the middle of the incision had some pus.  Thus, he re-opened the previous incision.  The implants were removed.  There appeared to be mobility in the fracture and a necrotic piece of bone in the diaphyseal

10

fragment.  It was debrided and the necrotic bone was removed.  There was no infected tissue.  [Tr. 130.]

On November 11, 2004, Garcia had a follow-up appointment.  He was doing well and did not have a fever.  The splint was removed and the wound appeared to be healing.  There were still some small open wound areas but without discharge.  The wrist was well-aligned.  Garcia was given a gauntlet wrist splint.  [Tr. 128.]

On November 29, 2004, Dr. Cheema saw Garcia.  The doctor stated that postoperatively, Garcia had done well and the wound had healed without infection.  Garcia complained, however, of residual pain on range of motion.  Still, Dr. Cheema noted the wound was well healed.  The range of motion was 10 degrees flexion, 10 degrees of extension of the left wrist.  Garcia was advised to use the gauntlet splint and to start using his left hand.  He was to return to the clinic in two months.  Dr. Cheema further noted that Garcia continued to be significantly symptomatic as far as pain was concerned and that they might need wrist arthrodesis in the future.  [Tr. 122.]

Another November 29, 2004 medical record indicates that there appeared to be nonunion or at least fibrous union of the comminuted distal radial fracture where the proximal end of the fracture was relatively more sclerotic than the distal aspect.  The ulnar styloid process fracture was nonunited.  The bones were diffusely osteopenic.  [Tr. 124.]

On November 29, 2004, Dr. Cheema filled out a one-page "functional limitations and work tolerance checklist" for the Department of Vocational Rehabilitation ("DVR").  [Tr. 179.]  Although it is difficult to decipher Dr. Cheema's signature on the form, Garcia testified that he observed Dr. Cheema filling out the checklist and signing it.  [Tr. 221.]  In this form, Dr. Cheema checked off the box that Garcia could work 6 out of 8 hours a day.  The form lists a number of activities and asks

which activities the client should avoid.  Next to the line stating "lifting 10 pounds or less," there appears to be a slash mark or an "x" and then the written words "can lift 10 pounds or less."  There is also an "x" placed in the next line that states lifting 10 to 25 pounds.  Dr. Cheema also placed "x's" in the lines for "throwing," "pushing", and "pulling".  Thus, from the form, it appears that Garcia was limited in lifting 10 pounds or less, and in throwing, pushing and pulling.  There were no other limitations marked on this form, even though there were lines for "handling" and "working with fingers."  Dr. Cheema wrote at the bottom of the form that Garcia had "post traumatic arthritis in the left wrist and nonunion of the left distal radius and osteomyelitis of the left distal radius."  [Tr. 179.] After the question, "is it permanent disability," the word "yes" was written.  After the question of whether Garcia was released to work part-time or full-time, Dr. Cheema wrote "part-time."

There are no other records indicating that Garcia sought medical treatment after November 29, 2004.

On January 3, 2005, Garcia filled out a disability function report with the assistance of staff from his attorney's office.  [Tr. 77.]  This report notes that Garcia got up in the morning, cooked breakfast, and cleaned the house, but with pain.  It took him a long time to do the chores.  He walked the dog every other day, paid bills, helped his daughters, ran errands, exercised his hands, did the laundry and prepared dinner.  [Tr. 77.]  He was unable to lift weights like heavy equipment.  He used to do his own car maintenance and maintenance around the house but no longer could do those things now.  His pain was constant and kept him up at night.  [Tr. 78.]  Garcia had trouble dressing, including tying his shoes, putting on clothes, zipping clothing and buttoning shirts.  He was able to prepare food or simple dishes daily.  His hands were stiff and painful.  Garcia went outside very other day and visited neighbors.  [Tr. 80.]  He could walk and drive but he only drove when he had to

12

because of pain and loss of feeling in his hands.  His hobbies were reading, walking the dog, chess, board games and walking.  Garcia had difficulties lifting, reaching, completing tasks, concentrating and using his hands.  [Tr. 82.]  He could lift 10 pounds with difficulty.  He was prescribed a brace or splint which he used for doing chores.  [Tr. 83.]

On January 28, 2005, a non-examining physician for the agency conducted a physical RFC assessment.  The physician determined Garcia could occasionally lift or carry 25 pounds and could frequently lift or carry 25 pounds.  [Tr. 181.]  Garcia could work six hours per day and was unlimited in his ability to push and pull.  The consulting doctor reviewed medical notes indicating that Garcia's right wrist healed without difficulty but that the left side was complicated by infection which required irrigation and debridement.  The non-examining physician also noted records showing that there had been an infected nonunion of the distal radius and that the x-ray of the left wrist on December 4, 2004 revealed significant post traumatic deformity with nonunion or possible fibrous union.   The last orthopedic visit on file was November 29, 2004.  The wound had healed at that time without infection, although Garcia complained of residual pain on range of motion.  The physician concluded there were manipulative limitations in his ability to handle and finger but that he was unlimited in the ability to reach and feel.  Garcia could handle and finger with the left side on a frequent basis and with the right side on a constant basis.  [Tr. 180, 183.]

On February 2, 2005, the SSA denied Garcia's request for reconsideration.  The Agency did not expect Garcia's condition to be severe enough to last a continuous 12-month period.  [Tr. 34.]

On February 4, 2005, Garcia filled out another disability report with the assistance of his attorney's staff.  He still had problems with range of motion in both wrists.  He had no feeling in his thumb.  He complained of continuous swelling in both wrists as of January 2005.  His hands tended

to become numb which caused him to drop things.  He did not drive often because of numbness.  It was painful to take showers, dress, or cook.  He walked the dog but with pain.  Garcia took Ibuprofen for pain.  [Tr. 85-93.]

The ALJ hearing was held on September 7, 2005.  Garcia's attorney clarified at the hearing that Garcia had been working part-time since April 18, 2005, cleaning offices for two hours, six nights a week.  He lifted trash weighing 15-20 pounds, "if that much." [Tr. 206.] Garcia testified that he lost the feeling in his hands and fingers and had no strength.  The problems in his wrists or hands impacted his arms as well, but he was not taking medications.  He stated he had been released to work but that he just could not do it.[11]  [Tr. 209.]  He had no problems sitting, standing or walking but could not lift or carry.  Every time he lifted something, he felt pain.  He could lift 10 pounds but not consistently.  [Tr. 209.]  He feared the loss of feeling in his fingers and did not drive because of this.  He still could work around the house, clean house, do the dishes, walk the dog, and perform yard work but all these activities took more time.

Garcia testified that he had not been drinking since 1998 when he had ulcer problems [Tr. 215], yet this contradicts medical records indicating he had been drinking when he fell from the ladder in 2004.  [Tr. 102.]

Garcia had splints or braces for his wrists but was not wearing them at the hearing.  He continued to testify that he had never been pain free since the injury.  He slept but with pain; he had trouble tying shoes or picking up small items.  [Tr. 211-13.]  He had attended DVR, and DVR

---

[11]It is not clear who released Garcia to work or whether he was released to work part-time by Dr. Cheema or full-time.

14

suggested he take coursework at TVI [Tr. 214.]  He intended to take basic courses in English, reading and math.  [Tr. 214.]

The vocational expert then testified.  The ALJ gave the following hypothetical: someone who was able to lift occasionally or carry including upward pulling of 25 pounds, who was unrestricted in standing, walking, sitting, pushing or pulling. He could frequently climb, balance, stoop, knee or crouch.  He could occasionally climb ladders, ropes or scaffolds and crawl.  He was unlimited in his ability to reach in all directions but was limited in his gross manipulation and fingering which would be fine manipulation.  He should avoid protracted exposure to extreme cold.  [Tr. 217.]

With these limitations in mind, the VE testified that Garcia could not perform his PRW because that work required lifting 50-80 pounds.  He could, however, perform the jobs of shipping and receiving weigher which was an unskilled, light job (222.387-074), sales attendant, customer service, a light unskilled job with a SVP of 2 (299.677-010), and surveillance system monitor sedentary work with a SVP of 2 (379.367-010).

Garcia's attorney asked a few questions of the VE.  In response, the VE testified that if Garcia was unable to perform fine manipulation and gross manipulation for 1/3 of the work day, he would not be able to do the customer service or shipping and receiving jobs.  Only the surveillance job would remain.

On January 12, 2006, the ALJ issued her decision denying benefits.  In so doing, the ALJ carefully and thoroughly discussed all medical history, including the primary physician's opinions, Garcia's reports of daily activities and the fact that Garcia did not continue to seek medical treatment and took only Ibuprofen for pain relief.  The ALJ gave Dr. Cheema's conclusions that Garcia had a 10 pound lifting limit and was capable of only part-time work "no significant weight because they are

15

not well supported by objective medical findings and are not consistent with the record as a whole."
[Tr. 16.]  The ALJ noted that Dr. Cheema's opinion was inconsistent with his own conclusion (on the checkbox form) that Garcia did not need to avoid handling and working with his fingers.  In other words, Dr. Cheema did not check off those boxes to indicate Garcia should avoid those activities.

The ALJ gave greater weight to the state agency evaluation showing that Garcia could perform a limited range of medium work with a lifting limit of 25 pounds frequently and occasionally "because it is better supported by objective medical findings and more consistent with the record as a whole, including . . . the claimant's daily activities, and his lack of recent medical treatment and use of only over-the-counter pain medications."  [Tr. 16.]

In denying the benefits applications, the ALJ also recognized Garcia's statements that he experienced loss of strength and feeling in his hands and that he had not been pain free since the date of injury.  However, the ALJ found his testimony of symptoms and functional limitations not to be fully credible based on the record as a whole.

The ALJ did not find Garcia capable of performing a full range of medium work.  Instead, she concluded that his ability to perform all or substantially all of the requirements of medium work was impeded by additional exertional or non-exertional limitations.  Thus, the ALJ sought testimony from a VE based on a hypothetical that included the ability to lift and carry 25 pounds both frequently and occasionally.

The ALJ rejected the testimony elicited from the VE by Garcia's counsel that if Garcia were limited to up to one-third of the day in his ability for fine and gross manipulation, he could not perform two of the three identified jobs.  The ALJ did not credit the limitation to occasional fine and gross manipulation because Dr. Cheema did not check off those boxes or lines on the one-page form.

However, the ALJ also stated, that even she were to credit that additional limitation, there would still be a significant number of jobs in the national economy that Garcia could perform.  [Tr. 18.]

**Discussion**

**LEGAL STANDARD**

Under the treating physician rule, the Commissioner generally gives more weight to treating physician's opinions than to non-treating physician's opinions.  Langley v. Barnhart, 373 F.3d 1116, 1119 (10th Cir. 2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).  The ALJ must first determine whether a treating physician's opinion qualifies for "controlling weight."  Langley, 373 F.3d at 1119 (*citing* Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003)).

> An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "consistent with other substantial evidence in the record."  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."

Watkins, 350 F.3d at 1300 (internal citations omitted).  Even if the ALJ determines that a treating physician's opinions are not entitled to "controlling weight," the "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  Id. (internal citation omitted).  Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301.

After the ALJ considers these factors, she must give good reasons in the written decision for the weight ultimately assigned to the treating doctor's opinions.  Id.  If the ALJ rejects the opinions completely, she must give specific, legitimate reasons for doing so.  Id.  In other words, while the ALJ is free to reject testimony, she must provide sufficiently specific explanations for discounting or disregarding a treating physician's opinion so that subsequent reviewers can ascertain the weight given to the treating physician's medical opinions and the reasons for that weight.  Id.

When a treating physician gives an opinion on the ultimate issue of disability, that opinion is not entitled to controlling weight.  See 29 C.F.R. § 416.927(e)(1); SSR 96-5p.  However, the opinion still must be evaluated by considering the factors provided in § 416.927(d).

Dr. Cheema was Garcia's treating physician and a specialist in orthopedic care.  During 2004, Dr. Cheema saw Garcia approximately eight times and performed three different procedures on Garcia's left wrist.  It is not clear what kind of testing Dr. Cheema may or may not have done with respect to his assessment that Garcia could lift no more than 10 pounds, but it is clear that Dr. Cheema examined and treated Garcia' wrists extensively.  He noted that Garcia had pre-existing significant arthritis in both wrists, but mostly on the left side.  The fracture on the left wrist was more comminuted and displaced.  The left wrist became infected and required four days of hospitalization and wound care, along with an incision and debridement procedure.  Even when Garcia appeared to be recovering well in August 2004, his volar flexion on the left side was only 15 degrees.

In October 2004, other UNM specialists noted that Garcia's left wrist was still problematic and that Garcia complained of significant pain along with limited range of motion.  The volar flexion was 10 degrees on that occasion, and the specialists determined that Garcia needed yet another

18

procedure to remove the hardware.  Dr. Cheema's October 2004 medical records indicate that the left wrist showed "no significant healing" along with "nonunion."

In removing the hardware in November 2004, Dr. Cheema discovered infected nonunion of the distal radius in the left wrist.  There was again purulent material.  Necrotic bone along with the implants were removed.  Even in late November 2004, when the wound appeared well healed, Dr. Cheema found that Garcia's range of motion was very limited: 10 degrees flexion and 10 degrees of extension.  Dr. Cheema noted that Garcia continued to be significantly symptomatic with pain in the left wrist and he speculated that Garcia might need wrist arthrodesis in the future.  The records continued to indicate nonunion or only fibrous union of the comminuted distal radial fracture even in late November to December 2004.

Notwithstanding Dr. Cheema's detailed reports and findings after three different procedures and one four-day hospitalization, the ALJ discounted Dr. Cheema's opinion that Garcia was limited to lifting or carrying no more than 10 pounds.  She gave Dr. Cheema's opinion "no significant weight" concluding that it was not well supported by objective medical findings and was not consistent with the record as a whole.  Based on the Court's reading of Garcia's medical records and Dr. Cheema's notes, his conclusion that Garcia was limited to lifting or carrying no more than 10 pounds was well supported by objective medical findings and consistent  Garcia's medical treatment and recurrent problems.

The ALJ makes no reference to what part of the record, including Dr. Cheema's documentation, did not support the specialist's opinion as to weight lifting restrictions, nor does the ALJ identify how Dr. Cheema's opinion is not consistent with the "record as a whole."  The only inconsistency that the ALJ points out is that on the one-page form prepared for DVR, Dr. Cheema

19

failed to place "x's" in the lines for "fingering" or "handling". Thus, the ALJ concludes that Dr. Cheema's weight lifting restriction for Garcia is inconsistent with no restrictions placed on Garcia's ability to finger or handle materials.

First, it not entirely certain that Dr. Cheema's weight lifting restrictions for Garcia are inconsistent with a failure to find restrictions for his abilities to finger and handle. Second, even if the restrictions on the form were internally inconsistent, this fill-in-the-blank type of form prepared at the request of another agency should not be used to discredit a treating physician's opinion when those opinions are well supported by other objective medical evidence in the record. Moreover, even if the ALJ concluded that there were internal inconsistencies within this one-page check-off-the-box form, the ALJ could have resolved any ambiguities by ordering a consultative physical exam of Garcia.

The Court is cognizant that the ALJ also reached her conclusion based on Garcia's daily activities, his lack of recent medical treatment and his use of over-the-counter medication. However, even if Garcia is able to do some housework, limited yard work, simple meal preparation, walk the dog and perform a 12-hour per week job where he lifts "15, 20 pounds if that much" this does not mean Garcia can do these types of tasks on a sustained or full-time basis. In other words, the Court does not find substantial evidence in the record to support the ALJ's finding that Garcia is able to lift or carry 25 pounds frequently.

The ALJ also determined that the agency's consultative physician's conclusions were entitled to more weight than those of Dr. Cheema. The Court disagrees. Here, the non-examining consulting physician's opinion that Garcia could lift or carry 25 pounds frequently and occasionally is not entitled to more weight than that of Dr. Cheema, who was the treating physician and a specialist.

20

Dr. Cheema last saw Garcia in late November 2004 and concluded he had a weight lifting limitation of 10 pounds or less.  Dr. Green, the consultative physician, who never examined Garcia, concluded two months later in late January 2005, that Garcia could frequently lift 25 pounds.  Yet, Dr. Green merely reviewed and repeated Dr. Cheema's medical notes and discussed the x-ray results, including the fact that a December 2004 x-ray showed "significant posttraumatic deformity with nonunion or possible fibrous union of the distal radius," that Garcia still complained of residual pain on range of motion, and that he only had 10 degrees of flexion and extension of the wrist.  [Tr. 182.] While the wound had healed without infection at this point, there is no objective medical evidence identified in the record to support a finding that Garcia could frequently lift and carry 25 pounds.

The Court concludes that it was error, based on the objective medical evidence in this record, not to have accorded Dr. Cheema's opinion controlling weight, and at a minimum, more deference than that assigned by the ALJ.  The Court does not find that the ALJ provided sufficiently specific or convincing reasons for disregarding Dr. Cheema's opinion as to Garcia's weight lifting restrictions.

Therefore, the Court remands so that the ALJ can again re-evaluate Garcia's treating physician's opinions in light of the pertinent law and regulatory criteria.  In the event that there are ambiguities with respect to Garcia's weight lifting capabilities, the ALJ may consider requesting a consultative physical exam.  Based on the Court's decision to remand, the Court does not reach Plaintiff's additional arguments for remand or reversal.

IT IS THEREFORE ORDERED that Garcia's motion to remand for a rehearing [Doc. 12] is GRANTED, and that this matter, therefore, is remanded for a rehearing so that the ALJ can address the issues described herein.

Lorenzo F. Garcia
Chief United States Magistrate Judge